IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| JENNIFER M. GIBSON,  )  | Case No. 1:16-cv-1909 |
|     Plaintiff,  ) | |
| ) | JUDGE DONALD C. NUGENT |
| v.  ) | |
| ) | MAGISTRATE JUDGE |
| COMMISSIONER OF SOCIAL SECURITY,  ) | THOMAS M. PARKER |
| ) | |
|     Defendant.  ) | |
| ) | **REPORT AND RECOMMENDATION** |
| ) | |

**I.    Introduction**

Plaintiff, Jennifer Gibson, seeks judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits ("DIB") and for supplemental security income ("SSI) under Titles II and XVI of the Social Security Act.  This matter is before the court pursuant to 42 U.S.C. §1383(c)(3), 42 U.S.C. §405(g) and Local Rule 72.2(b).

Because the ALJ supported her decision with substantial evidence and she made no harmful error in her application of law[1], I recommend that the final decision of the Commissioner be AFFIRMED.

---

[1] As further explained herein, it appears that the ALJ erred by not including an express pace limitation in her RFC finding.  However, she included such a limitation and asked the VE a hypothetical question including it.  Thus, the VE's response to the question is substantial evidence that jobs existed that could be performed by someone with Gibson's RFC, *pace limitation included.*

## II. Procedural History

Gibson filed an application for DIB on November 5, 2012 (Tr. 231) and for SSI on May 15, 2014. (Tr. 25) Ms. Gibson alleged her disability began on September 18, 2011. (Tr. 231) Gibson's application was denied initially on January 2, 2013 (Tr. 128) and upon reconsideration on April 5, 2013. (Tr. 138) Gibson requested a hearing on May 1, 2013. (Tr. 148) Administrative Law Judge Penny Loucas conducted a hearing on August 6, 2014. (Tr. 46-92) On October 21, 2014, the ALJ denied Ms. Gibson's claims for benefits. (Tr. 22-40) The Appeals Council denied review of the ALJ's decision on May 26, 2016, rendering the ALJ's October 21, 2014 decision the final decision of the Commissioner. (Tr. 1-3)

## III. Evidence

### A. Personal, Educational, and Vocational Evidence

Gibson was 41 years old on the date of the hearing. (Tr. 53) She had a high school education and past work experience as a scheduler and order processor at a company that made CPR mannequins. (Tr. 53-54)

### B. Medical Evidence

Gibson was admitted to the hospital on May 18, 2010 for an occipital headache. She reported having a headache once per month. Pain medication resolved her headache and she was discharged with ibuprofen. (Tr. 428)

Gibson treated by family doctor, Dr. Alexa Raymond, from September 2010 through October 2012. During this time period, Dr. Raymond treated Gibson for asthma, leg cramps, peptic ulcer disease, infectious colitis, depression, anxiety and headaches. (Tr. 330-332, 351-353, 355, 357, 359, 361, 363, 365, 367, 369)

On January 10, 2011, Gibson presented to the Digestive Health Institute for a follow-up appointment of her gastric ulcers. Dr. Gerald Isenberg felt that her ulcers were likely caused by Motrin use for headaches. He instructed that she increase her fiber intake and avoid fried, fatty foods. He also instructed her to stop drinking alcohol on a daily basis. (Tr. 375) In March 2011, Gibson went to the emergency room with bloody diarrhea and was diagnosed with infectious colitis. She started taking Cipro and Flagyl and her symptoms resolved. (Tr. 372)

On September 30, 2011, Gibson went to the emergency room complaining of a headache. A CT scan returned normal results. (Tr. 309-10) She returned to the emergency room with a headache in October 2011, (Tr. 313-315) and again in April 2012. (Tr. 324-327)

In October 2011, Daniel Koontz, M.D., saw Gibson for a neurological consultation. Dr. Koontz noted that Gibson was having frequent headaches, almost every day. Gibson reported scalp pain which prevented her from brushing her hair. (Tr. 418) Dr. Koontz's impression was migraines, with some symptoms of allodynia. He prescribed Topamax. (Tr. 419) On November 17, 2011, Dr. Koontz wrote a letter indicating that Gibson had been unable to work since October 19th due to intractable migraine and occipital neuralgia. He felt that she would be able to return to work in another week. (Tr. 417) On December 21, 2011, Dr. Koontz also completed a questionnaire for Unum Life stating that Gibson may need intermittent leave due to her migraine headaches. He anticipated that she would be able to return to work part-time on December 21, 2011. (Tr. 415-416)

Gibson followed-up with Dr. Koontz on January 12, 2012. She continued to complain of severe headaches and reported having numbness in her right arm that lasted for the better part of a day. Dr. Koontz ordered an MRI and noted that she should see a psychiatrist if she continued to have mood problems. (Tr. 370) Dr. Koontz wrote a note stating that Gibson was unable to

3

return to work until February 12th. (Tr. 412)  The MRI obtained on January 20, 2012 revealed a single nonspecific focus of increased T2 signal intensity within the left frontal white matter, not changed since a previous examination in November 2009, but otherwise unremarkable results. (Tr. 411)

Gibson met with Dr. Koontz on April 26, 2012.  She was continuing to complain of severe headaches.  Dr. Koontz increased Gibson's prescription for Depakote and encouraged her to see a psychiatrist. (Tr. 410)  Dr. Koontz provided a statement to Unum Life Insurance indicating that Gibson was unable to work because of her headaches.  (Tr. 407)

Gibson attended counseling from Northcoast Afrocentric Counseling Services starting in March 2012.  Paula English, Ph.D., noted that Gibson was seeking counseling to help her deal with work stress, recent break-up of a relationship, coping with chronic migraines and childhood abuse.  Dr. English diagnosed major depressive disorder, single episode.  (Tr. 420)

In July 2012, Gibson's employer recommended a mental health assessment.  (Tr. 405) The Center for Families and Children performed the assessment (Tr. 393) noting that Gibson was well groomed, her thoughts were logical, her mood was angry and her speech was normal. (Tr. 405)  Gibson reported depression, difficulty sleeping, lack of interest in activities that used to be pleasurable, poor concentration, feelings of worthlessness, agitation and irritability. (Tr. 393-94) Gibson was resistant to treatment but agreed to individual counseling with a female service provider. (Tr. 405)

Psychiatric resident, Dr. Richard Linsk, evaluated Gibson on August 8, 2012.  Gibson complained of migraines and depression.  She reported that her headaches began in September 2011 due to stress related to her job, relationship, and her 18 year-old daughter.  She was having thoughts of suicide.  She was worried about being harmed by others and thought about the uncle

4

who had molested her when she was 8 years old. She was afraid she would lose her temper and let go of anger. (Tr. 339) Dr. Linsk observed that Gibson was depressed; her affect was constricted with occasional agitation. Her thought content was positive for passive suicidal ideation and dwelling on lack of caring or abuse by others. (Tr. 341) Dr. Linsk diagnosed major depressive disorder, chronic, currently moderate without psychotic features and post-traumatic stress disorder. He assigned a Global Assessment of Functioning ("GAF") of 51. (Tr. 342)

Gibson followed-up with Dr. Linsk on September 6, 2012. She was taking Remeron intermittently but it was not helping with sleep. She rated her depression as unchanged and 8/10 and her anxiety as 10/10. Her appetite was poor and she was not socializing. She was well-groomed with fluent speech but negative thought content. Dr. Linsk diagnosed major depression – recurrent, non-complaint with Remeron; disabled through work and being harassed. Dr. Linsk adjusted Gibson's medications. (Tr. 343)

Gibson met with Dr. Linsk a couple of times in October 2012. Gibson described ongoing depression, anxiety and difficulties with sleep. (Tr. 344-346) In January 2013, Dr. Linsk noted that Gibson became anxious when demands were put on her at work and she felt she needed a different job. She was having fewer headaches due to reduced stress. She was still having scalp pain and difficulty sleeping. (Tr. 435-436)

On September 10, 2012, Dr. Linsk provided a short statement to Unum Benefits Center stating that he was treating Gibson for major depression and that she might be able to return to work when her mood improved. (Tr. 385)

Gibson followed up with Dr. Linsk in March 2013. She was frustrated with her daughter and spending most of her time in isolation. She was sleeping better. Her migraines had

5

decreased to every 1-3 months.  Dr. Linsk diagnosed ongoing major depression and increased Gibson's prescriptions. (Tr. 439-440)

In February 2014, Dr. Linsk noted that he had been seeing Gibson biweekly for 18 months since she went on disability but that her disability period was ending.  He noted that her depression was significantly improved.  She was sleeping well and her mood was good.  She was planning a vacation in a few weeks with her boyfriend who lived in Afghanistan.  Her social anxiety was in control but she reported that she became anxious about being around people, "for example at a party where she sometimes works as a photographer."  However, she was stressed about loss of income and lack of employment.  (Tr. 462-463)

In March through June of 2014, Gibson suffered from bilateral knee pain. (Tr. 546, 540)  She underwent treatment including physical therapy for her knee pain.  (Tr. 526, 529)  In August and September 2014, Gibson sought additional treatment for her left lower leg.  (Tr. 565-569)  It is unnecessary to include a more thorough explanation of this treatment, because Gibson's appeal is related to her mental impairments alone. *Kennedy v. Comm'r of Soc. Sec.,* 87 F.App'x 464, 466 (6th Cir. 2003) (issues not raised in claimant's brief are waived).

On July 11, 2014, Gibson was seen by Dr. Sarah Engle for an initial psychotherapy evaluation. (Tr. 560-564)  Gibson requested weekly therapy and medication management.  Dr. Engle described Gibson as an "[o]verweight, ill-appearing woman with a scowl on her face." (Tr. 561)  Mental status examination showed that Gibson was cooperative, with intermittent eye contact, fast rate of speech, very talkative but not pressured.  Her affect was anxious and constricted. (Tr. 563)  Dr. Engle found Gibson to suffer from major depression, post-traumatic stress disorder, and anxiety disorder, with worsening depression and anxiety in the context of

6

multiple recent psychosocial stressors. Gibson's medications for depression and insomnia were continued. (Tr. 564)

### C. Opinion Evidence

#### 1. Treating Physician – Dr. Richard Linsk

On June 18, 2014, Dr. Linsk completed a questionnaire regarding Gibson's mental abilities to perform unskilled work. (Tr. 551-552) He opined that she would <u>not</u> be able to: work in coordination with or proximity to others without being (unduly) distracted by them, complete a normal workday and workweek without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, accept instructions and respond appropriately to criticism from supervisors, or get along with coworkers or peers without (unduly) distracting them or exhibiting behavioral extremes. (Tr. 551)

When asked to provide examples supporting his opinion, Dr. Linsk wrote, "Ms. Gibson has major depressive disorder and post-traumatic stress disorder causing her to be persistently irritable and reactive to social slights and comments from others. She is self-isolating due to fear of judgment by others and paranoia about being attacked. Every week in therapy she would come in with another story of people being angry at her- strangers on the street or in stores, family members. She has a constant expression of anger and antagonism on her face. Strangers ask her what her problem is. On one occasion she told a woman that her baby was ugly and said she could not understand why the woman was angry with her. She provokes others then gets angry and hostile when they respond. She is afraid of rejection of the job search process." Dr. Linsk affirmed that Gibson's symptoms had existed with a similar degree of severity since the spring of 2012. He concluded that Gibson "is an intelligent woman who could do well with

interesting work not involving interactions with others. She will not get along with a supervisor." (Tr. 552)

On June 28, 2014, Dr. Linsk completed questionnaires related to Gibson's affective disorder and anxiety related disorders. (Tr. 468-471) In these documents, Dr. Linsk listed Gibson's diagnoses as major depressive disorder and post-traumatic stress disorder. Her depressive symptoms included anhedonia or loss of interest; sleep disturbance, decreased energy; feelings of guilt and worthlessness; difficulty concentrating or thinking; and depressed mood. Symptoms of anxiety included motor tension, apprehensive expectation, vigilance and scanning, and anger and reactivity to minimal interactions with others. Dr. Linsk also wrote that Gibson had an irrational fear of interacting with people; that she had recurrent severe panic attacks; and recurrent and intrusive recollections of a traumatic experience. Dr. Linsk opined that Gibson had mild restrictions of activities of daily living; marked difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace. He noted that she felt paralyzed with the thought of being judged or rejected or being verbally attacked by others. He stated that she had three episodes of decompensation each of extended duration in the last year triggered by seeing family, being robbed, financial stress, and by being unable to overcome anxiety and fatigue. (Tr. 468-471)

### 2. Reviewing Physicians – Tonnie Hoyle, Psy.D. and Cynthia Waggoner, Psy.D.

Tonnie Hoyle, Psy.D. reviewed Gibson's records on December 13, 2012. (Tr. 105-107) Dr. Hoyle opined that Gibson had severe impairments of affective disorder and an anxiety disorder. She felt that Gibson had moderate restrictions in activities of daily living and in maintaining concentration, persistence or pace; mild difficulties in maintaining social functioning; and no repeated episodes of decompensation. (Tr. 105) Dr. Hoyle found Gibson's

8

"statements regarding symptoms considering the total medical and non-medical evidence in the file" to be "fully credible." (Tr. 106) And she specifically found, "Psych statements are credible and supported by mer in file. She does appear preoccupied by her condition however, she also remains cognitively intact." (Id.) Dr. Hoyle opined that Gibson would be able to perform work "in a setting without fast pace and in a setting without frequent changes." (Tr. 107)

On April 3, 2013, Cynthia Waggoner, Psy.D., reviewed Gibson's records and affirmed Dr. Hoyle's findings using nearly identical terminology. The only different finding made by Dr. Waggoner related to Gibson's "statements regarding symptoms considering the total medical and non-medical evidence in the file." Dr. Waggoner found them to be "partially credible.". (Tr. 118-119)

### D. Testimonial Evidence -

#### 1. Gibson's Testimony

At the August 6, 2014 hearing, Ms. Gibson testified:

- Gibson's disability claim was based on her migraine headaches and her mental impairments. (Tr. 51)

- Gibson completed high school. (Tr. 53)

- For a few years, Gibson worked for a company making CPR mannequins. She initially scheduled CPR classes and later worked in the order department , (Tr. 53-56)

- She then worked for the Cleveland Clinic as a patient service representative checking-in patients for doctors' appointments. She left that job because she was taking a lot of sick days and was going through a break-up with her daughter's father. (Tr. 64-65)

- Gibson next worked for about a year as a customer service order clerk for a company called Global Promotions. She left that job because she was having heart palpitations and the company was downsizing. (Tr. 65-66)

- Gibson also worked for Time Warner but went on short term disability in September 2011. She received long-term disability until April 2014. (Tr. 69-70)

9

- Gibson was suffering from migraines with blurred vision and sensitivity to light three or four days a week. Gibson would lie down and place a cold rag over her head and eyes when she got a migraine. She was also taking prescribed medications that lessened her pain. (Tr. 73-74)

- Gibson lost her health insurance for some time and was unable to receive regular treatment for her migraine headaches. During that period, she visited the emergency room several times and took Motrin for pain. Her frequent use of Motrin had caused her to develop ulcers. (Tr. 75)

- Gibson treated with Dr. Linsk and a therapist for about two years. Gibson did not trust people. She had very little social interaction with anyone other than her daughter and mother. She had a boyfriend in Afghanistan. (Tr. 77, 79)

- Gibson testified that she cried often. She was not showering or going out every day. (Tr. 79)

- Gibson loved photography and tried to photograph a wedding, but she found it difficult to handle the people at the wedding. (Tr. 81)

    2.    **Vocational Expert's Testimony**

Vocational Expert ("VE") Gail Klier testified:

- The VE considered Gibson's past work to be that of customer order clerk or an inventory control clerk, a medical secretary, and a customer service representative, clerical. (Tr. 60, 63, 81, 82)

- The ALJ asked the VE to consider a hypothetical individual similar to the Gibson in age, education and work history who had no exertional, memory or social limitations, who could maintain concentration, persistence, and pace over a normal eight hour work day and 40 hour work week for work that was not machine pace driven, with no strict production quotas, and with up to occasional changes in the workplace setting. (Tr. 83-84)

- The VE opined that this individual would not be able to perform Gibson's past work. However, she would be able to perform the job of addresser with the number of existing jobs reduced somewhat based on the VE's experience. (Tr. 85-86) The individual could also perform the jobs of companion and desk receptionist. The VE testified that there were a significant number of regional, state and national jobs available for these positions. (Tr. 86-87)

- The ALJ then asked the VE to consider a hypothetical individual with no exertional or memory limitations who could maintain concentration, persistence and pace over a normal eight hour work day and work week, but was limited to occasional interaction with the general public, coworkers and supervisors. She could speak, signal, take

10

    instructions, carry-out instructions, but she could not adjust to occasional changes in the workplace. (Tr. 87)

- The VE testified that this individual would be able to perform the job of addresser but would not be able to perform the jobs of desk receptionist or companion. This individual could also perform the jobs of linen room attendant, cleaner and general house worker. The VE testified that there were a significant number of regional, state and national jobs available for these positions. (Tr. 88-89)

- Finally, the ALJ asked the VE to assume that the individual would be off work once every three months. The VE testified that this criteria would not impact short term temporary jobs but may impact the productivity and ability to keep a long-term job. (Tr. 89)

- Gibson's attorney then asked the VE to assume that the hypothetical individual could not interact with the public or coworkers, could have only occasional interaction with supportive and non-authoritative supervisors, and would miss four hours of work a week for treatment or to deal with symptoms. The VE testified that this individual would not be able to perform any work. (Tr. 90)

## IV.  Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(a). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[2]....

42 U.S.C. § 423(d)(2)(A).

---

[2] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423 (d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment,[13] claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert,* 482 U.S. 137, 140-142 (1987). Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.* 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to produce evidence that establishes whether the claimant has the RFC and vocational factors to perform work available in the national economy. *Id.*

## V.     ALJ's Findings and Decision

The ALJ issued a decision on October 21, 2014, issuing the following summarized findings:

1. Gibson met the insured status requirements of the Social Security Act through March 31, 2015. (Tr. 27)

2. Gibson had not engaged in substantial gainful activity since September 18, 2011, the alleged onset date. (Tr. 27)

3. Gibson had the following severe impairments: depression and anxiety. (Tr. 27)

4. Gibson did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. (Tr. 28)

5. Gibson had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels but with the following nonexertional limitations: No memory limitations: ***can maintain concentration, persistence, or pace over a normal eight hour work day and 40 hour workweek***; is limited to occasional interaction with general public, coworkers and supervisors; can speak, signal, take instructions and carry out instructions; and can adjust to occasional changes in the workplace setting. (Tr. 30, emphasis added)

6. Gibson was unable to perform her past relevant work. (Tr. 38)

7. Gibson was born on July 30, 1973 and was 38 years old, a younger individual between the ages of 18 to 49, on the alleged disability onset date. (Tr. 38)

8. Gibson has a high school education and is able to communicate in English. (Tr. 38)

9. Transferability of job skills was not material to the determination because the Medical-Vocational Rules supported a finding that she was "not disabled" whether or not she had transferable job skills. (Tr. 38)

10. There were a significant number of jobs that Gibson could perform. (Tr. 39)

Based on these findings, the ALJ determined that Gibson was not under a disability since September 18, 2011, the alleged onset date. (Tr. 39)

## VI. Law & Analysis

### A. Standard of Review

This court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the ALJ correctly applied the applicable legal standards. *See Elam v. Comm'r of Soc. Sec.,* 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker,* 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial

evidence has been defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.,* 25 F.3d 284, 286 (6th Cir. 1994).

The Act provides that "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §§ 405(g) and 1383(c)(3). The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter,* 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen v. Bowen,* 800 F.2d 535,545 (6th Cir. 1986); *see also Her v. Comm'r of Soc. Sec.,* 203 F.3d 288, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached." *See Key v. Callahan,* 109 F.3d 270, 273 (6th Cir. 1997). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen,* 800 F.2d at 545 (*citing Baker v. Heckler,* 730 F.2d 1147, 1150 (8th Cir. 1984).

The court must also determine whether proper legal standards were applied. If not, reversal is required unless the error of law is harmless. *See e.g. White v. Comm'r of Soc. Sec.* 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do

not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue,* 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996); *accord Shrader v. Astrue,* No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue,* No. 1:10-cv-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue,* No. 2:10-CV-017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).

### B. Whether Substantial Evidence Supports the ALJ's RFC Finding

Gibson argues that the ALJ's RFC finding was not supported by substantial evidence because it did not account for the pace limitation opined by Drs. Hoyle and Waggoner, the state agency reviewing physicians.[3] The ALJ, not a physician, is assigned the responsibility of determining a claimant's RFC based on the evidence as a whole. 42 U.S.C.A. § 423(d)(5)(B); 20 C.F.R. § 416.946(c). The regulations require the ALJ to evaluate several factors in determining the RFC, including the medical evidence (not limited to medical opinion testimony), and the claimant's testimony. See *Henderson v. Comm'r,* 2010 U.S. Dist. LEXIS 18644 (N. Dist., October 13, 2009) citing, *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629 633 (6th Cir. 2004); SSR 96-5p, 1996 SSR LEXIS 2, SSR 96-8p, 1996 SSR LEXIS 5. The final responsibility for deciding the RFC "is reserved to the Commissioner." 20 C.F.R. § 416.927(e)(2). Although the Commissioner determines a claimant's residual functional capacity, the ALJ must follow the regulations when considering the medical evidence, including the medical opinions in the record.

---

[3] ECF Doc. 16, Page ID# 1244-1247.

SSR 96-8p provides that "[t]he RFC assessment must always consider *and address* medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator *must explain why the opinion was not adopted*." (Emphasis added.) However, while an ALJ "'must consider findings of [s]tate agency medical and psychological consultants,' [s]he is 'not bound by any findings made by [s]tate agency medical or psychological consultants.'" *Renfro v. Barnhart*, 30 F. App'x 431, 436 (6th Cir.2002)(quoting 20 C.F.R. § 404.1527(f)(2)(i)).

Here, Gibson does not argue that the ALJ failed to consider the opinions of state agency doctors Hoyle and Waggoner, she argues that the ALJ's RFC finding conflicted with their opinions because the ALJ ignored the Hoyle and Waggoner pace limitations. Gibson correctly points out that the ALJ did not mention Dr. Hoyle's opinion at all in her decision. However, Dr. Hoyle's opinion was nearly identical to the opinion expressed by Dr. Waggoner. Thus, any error in the ALJ's failure to specifically mention the opinion of Dr. Hoyle is harmless because the ALJ did mention the same opinion as expressed by Dr. Waggoner..

In addressing Dr. Waggoner's opinion, the ALJ stated:

[T]he other non-examining state agency doctor, Cynthia Waggoner, Psy.D. opined on the same day that the claimant's depression and anxiety were severe. She opined the claimant exhibited moderate restriction of activities of daily living; mild difficulties in maintaining social functioning; ***moderate difficulties in maintaining concentration, persistence, or pace***; and no repeated episodes of decompensation, each of extended duration. I give her opinion some weight in that the impairments are severe but the weight is reduced because of her opinions in the Part B evaluation. Instead, I find the claimant has mild limitations in daily activates [sic] because she is independent in her activities of daily living and has managed her short term and long term disability benefits. Although the claimant may report irritability toward others, she socializes adequately to maintain a relationship with her boyfriend, mother and daughter. As such, she has no more than moderate limitations. Hence, I have included a limitation with regard to her contact with others, which is in line with treatment records.

16

(Tr. 36-37)  The ALJ's discussion reflected bare compliance with the regulations because she addressed the Waggoner opinion and offered a partial explanation for the weight she assigned to the opinions of the non-examining physicians.

Specifically, the ALJ indicated she gave "some" weight to the Waggoner opinion because she concluded that Gibson had only a mild limitation in her activities of daily living, not a moderate one.  She made that finding because she found Gibson to be independent in her activities of daily living to have managed her short and long term disability benefits.  (Tr. 36-37)  She also noted her ability to socialize with certain persons despite her irritability toward others.  (Id.)  On the adaptability limitation, the ALJ concluded, ". . . I have included a limitation with regard to her contact with others, which is in line with her treatment records."  (Id.).  Plainly, this limitation, included in the RFC as: "is limited to occasional interaction with general public, coworkers and supervisors; can speak, signal, take instructions and carry out instructions; and can adjust to occasional changes in the workplace setting" deals with the ALJ's modification of the "ability to respond appropriately to changes in the work setting" finding in Waggoner's report.  (Tr. 119)

Gibson contends that the ALJ erred in failing to include Dr. Hoyle and Dr. Waggoner's pace limitation in the RFC finding.  Both of the reviewing physicians opined that Gibson was capable of performing work in a setting "w/out fast pace." (Tr. 107, 119)   Gibson correctly points out that the ALJ's RFC finding includes no pace limitation at all.  Instead, it states: "can maintain concentration, persistence or pace over a normal eight hour work day and 40 hour workweek." (Tr. 30).  The essence of Gibson's argument is not that the ALJ failed to consider the opinions of Drs. Hoyle and Waggoner, but that, instead, her analysis of those opinions was incomplete because she did not address each moderate limitation they expressed and incorporate

17

that into the RFC.  Gibson impliedly contends that the employment positions the ALJ found a person with Gibson's capabilities could perform were not supported by substantial evidence because there was no way to know whether those jobs could be performed in a setting "without face pace."

Gibson asserts that *Ealy v. Comm'r of Social Security*, 594 F.3d 504, 516-517 (6th Cir. 2010) and its progeny require a remand in this case.  I do not agree.  In *Ealy,* both the ALJ's hypothetical question and matching RFC finding failed to include the pace limitation found by the credited state agency consultant.  Thus, the RFC determination "inadequately described" the claimant's limitations, which, in turn, disqualified the vocational expert's testimony from serving as substantial evidence that the claimant could perform the work identified by the VE.  *Id.* at 517.  Such is not the case here.

Although the ALJ here plainly did not include the pace limitation expressed by Drs. Hoyle and Waggoner in her RFC finding, she did include a pace limitation in the first hypothetical question to the VE.  That hypothetical asked the VE to consider an individual who could "maintain concentration, persistence, and pace over a normal eight hour work day and a 40 hour work week *for work that is not machine paced driven, no strict production quotas, and has up to occasional changes in the work place setting*."[4] (Tr. 83-84, emphasis added)  Although the wording of this hypothetical question is not a verbatim restatement of the pace limitation expressed by Drs. Hoyle and Waggoner, the use of the phrase "not machine paced driven, no strict production quotas" plainly reflects an attempt to incorporate a pace limitation when asking

---

[4] Gibson might argue that the ALJ relied on the VE's responses to the second hypothetical question asked during the administrative hearing.  However, the second hypothetical question was more restrictive and involved an individual who could not adjust to occasional changes. (Tr. 87)  The fact that the ALJ's RFC assessment includes a finding that Gibson *can* adjust to occasional changes in the workplace setting suggests that the ALJ relied on the VE's answers to the first hypothetical question.  Pace limitations were expressly included in the first hypothetical question. (Tr. 83-84)

18

the VE to opine on the availability of work for someone with Gibson's sort of limitations. In response, the VE opined that there were jobs in significant numbers that such an individual could perform. This testimony satisfied the Commissioner's burden at the fifth step of the sequential evaluation process. *Lee v. Comm'r of Soc. Sec.,* 529 Fed. Appx. 706, 715 (6th Cir. 2013), citing *Ealy,* 594 F.3d at 512-513.

I conclude that the ALJ erred in failing to include Gibson's pace limitation in her formulation of the RFC. (Tr. 30). However, the error was harmless because the ALJ sufficiently incorporated a pace limitation in her first hypothetical question to the VE. By doing so, the ALJ ensured that the jobs the VE opined someone like Gibson could perform were only jobs that a person with a moderate pace limitation could handle.

Moreover, it bears mention that the ALJ evaluated the entire medical administrative record, including findings by the treating mental health professionals Drs. Linsk and Engle. The opinions of Drs. Hoyle and Waggoner were expressed in 2012 and 2013 respectively. Drs. Linsk and Engle treated Gibson for over a year and a half thereafter, noting her steady improvement when receiving mental health care, as noted in the description of the medical history above. This court cannot simply assume that the ALJ gave no consideration to the entire record when making her RFC finding or in formulating her questions to the VE. Gibson did not adduce sufficient evidence during the administrative phase of her claim to support her contention that she was disabled. I recommend the final decision of the Commissioner be affirmed on this basis despite the errors committed by the ALJ.

**VII.  Recommendation**

The ALJ's omission of the RFC's pace limitation in her decision was error, as Gibson argues. But the ALJ's first hypothetical to the VE included a pace limitation consistent with the

19

opinions of the state agency reviewing physicians. For this reason, substantial evidence supports her determination that plaintiff is not disabled because there are jobs someone with her limitations can perform. Gibson has not demonstrated a sufficient basis upon which to reverse or remand the Commissioner's decision, and I recommend that the final decision of the Commissioner be AFFIRMED, pursuant to 42 U.S.C. §405(g).

Dated: October 25, 2017

Thomas M. Parker
United States Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may waive the right to appeal the District Court's order. See *U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981). See also *Thomas v. Arn,* 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).